**AFFIRMED as Modified; and Opinion Filed December 4, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-01442-CR**
_____

**DARRELL DEWAYNE MORGAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F11-60422-X**

## MEMORANDUM OPINION

Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Myers

Appellant Darrell Dewayne Morgan was convicted of the offense of possession of one gram or more but less than four grams of cocaine, with the intent to deliver, and was sentenced to eighteen years in the Institutional Division of the Texas Department of Criminal Justice. In two issues, he argues the trial court erred by denying his motion to suppress and that the judgment should be reformed to reflect a plea of "not true" to the enhancement paragraph. As modified, we affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

According to the testimony of Officer David Roach of the Dallas Police Department, the only witness who testified at the motion to suppress hearing, on September 28, 2011, at approximately 10:00 p.m., Dallas police officers received an anonymous tip regarding the sale of narcotics from an apartment, number 101, located at 2811 Holmes Street in Dallas, Texas. After

Roach and the other officers reached the location and approached the apartment, one of the officers noticed the electricity meter for apartment 101 had been "tampered with" and that the apartment was receiving stolen electricity.

Planning to conduct a "knock and talk" to investigate the narcotics complaint, the officers moved towards the front door of the apartment by walking up the steps located on Holmes Street and entering the breezeway that allowed access to all eight apartments in the two-story complex. A ramp was located to the left of the stairs. The path to the breezeway was not enclosed by any fence, and was open to the public. A gate located in front of the breezeway was open when the officers arrived. On the lower level of the complex, to the left of the breezeway, was apartment 101. The apartment's front door was just inside the breezeway; the front window faced Holmes Street.

Roach approached the apartment window by walking on the grass located in front of the complex. A small flowerbed was situated in front of the window; from the front of the building the flowerbed was "[m]aybe a foot and a half" in width. The window had an air conditioning unit located in it. There was a "no trespassing" sign on the window. The blinds on the window were open and the curtain was tied up.

Roach remained on the grass and did not step over or into the flowerbed. When he looked into the window, he saw appellant standing in the living room holding a gallon-sized Ziplock bag that contained what Roach believed to be marijuana and U.S. currency. Roach estimated that appellant was "between six and ten feet" from where he was standing outside the window.

Roach testified that he could see appellant because the light from the television screen illuminated the room. Roach also saw another individual, Natasha Thomas, sitting on one of two couches. When he shined his flashlight into the living room, Roach saw appellant throw the

baggie of marijuana onto a couch and run down the hallway. Before doing so, appellant grabbed an item containing "several orange translucent baggies" from an end table next to the couch, and "threw the contents of that object into the bathroom and the hallway." Upon seeing the light from Roach's flashlight, Thomas began screaming, "[F]lush the rock, flush the rock!' Roach told Thomas to put her hands up and get on the floor, which she did.

Roach testified that the orange baggies were "consistent with the packaging of crack cocaine," and that, based on what he had observed, his first "thought was that [appellant] was attempting to destroy evidence of the narcotics." Roach added: "And then as he ran down the hallway and entered the secondary bedroom, we were unsure what was in the bedroom. It could have been more evidence and possibly a weapon." After he saw appellant run down the hallway and heard Thomas shout "flush the rock," Roach yelled for his other team members to enter the apartment, but they were unable to do so because of a cage that surrounded the front door. Roach told Thomas to open the front door, and she complied. After the officers entered the apartment and took appellant and Thomas into custody, a "presumptive field test" conducted by Roach showed the substance in the Ziplock bag tested positive for marijuana. The officers also tested the substance in the three orange baggies, each of which had a "positive result for cocaine."[1]

The trial court denied the motion to suppress. Appellant was subsequently convicted of the charged offense by a jury, which found the enhancement paragraph true and assessed an eighteen-year prison sentence. This appeal followed.

### DISCUSSION

### 1. MOTION TO SUPPRESS

---

[1] After appellant and Thomas were arrested, officers contacted the narcotics division, which instructed the officers that, based on the circumstances, a search of the apartment was unnecessary, so a warrant was not obtained.

In this first issue, appellant argues the trial court erred by denying the motion to suppress. Appellant contends Roach made his observations from the curtilage of appellant's apartment, and that the officer was not on the public pathway to the front door—the lawful means of access—nor was he lawfully entitled to be standing in front of the window when he observed appellant holding the bag of marijuana. Furthermore, the "no trespassing" sign on the window "enhanced" appellant's expectation of privacy.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of the law to the facts *de novo*. *Id*. We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Id*.; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex. Crim. App. 1997)). We review mixed questions of law and fact that do not depend on credibility and demeanor as well as purely legal questions *de novo*. *State v. Woodward*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Guzman*, 955 S.W.2d at 89. As a general rule, we view the evidence in the light most favorable to the trial court's ruling and afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Turrubiate*, 399 S.W.3d at 150.

*Applicable Law*

Warrantless entries into homes are presumptively unreasonable. *Turrubiate*, 399 S.W.3d at 151. "When a defendant moves to suppress evidence based on a warrantless search, the State has the burden of showing that probable cause existed at the time the search was made and that exigent circumstances requiring immediate entry made obtaining a warrant impracticable." *Id.*; *see also Pair v. State*, 184 S.W.3d 329, 334 (Tex. App.—Fort Worth 2006, no pet.). Probable cause to search exists when reasonably trustworthy circumstances within the knowledge of the police officer on the scene would lead the officer to reasonably believe evidence of a crime will be found. *Turrubiate*, 399 S.W.3d at 151.

> If probable cause exists, exigent circumstances may require immediate, warrantless entry by officers who are (1) providing aid to persons whom law enforcement reasonably believes are in need of it; (2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; or (3) preventing the destruction of evidence or contraband.

*Id.* (citing *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007)).

The curtilage of a person's home, which is the area immediately surrounding and associated with the home, is protected by the Fourth Amendment. *See Florida v. Jardines*, 185 L. Ed. 2d 495, 133 S. Ct. 1409, 1414–15 (2013); *State v. Betts*, 397 S.W.3d 198, 207 (Tex. Crim. App. 2013). Whether a particular area is included within the home's curtilage is determined by whether the defendant had a reasonable expectation of privacy in the area. *Matthews v. State*, 165 S.W.3d 104, 113 (Tex. App.—Ft. Worth 2005, no pet.). Curtilage includes a home's doors and porch but not open fields, which are outside the bounds of the home and are not immediately surrounding and associated with the home. *See Jardines*, 133 S. Ct. at 1412; *United States v. Dunn*, 480 U.S. 294, 303 (1987); *Oliver v. United States*, 466 U.S. 170, 180–81 (1984). Similarly, curtilage does not include public spaces such as the common areas or hallways of an apartment complex. *See Evans v. State*, 995 S.W.2d 284, 285–86 (Tex. App.—Houston [14th

Dist.] 1999, pet. ref'd) (concluding that fenced-in common area of apartment complex, open to other residents and guests, was not part of curtilage of defendant's apartment protected by Fourth Amendment); *see also U.S. v. Miravalles*, 280 F.3d 1328, 1332–33 (11th Cir. 2002) (tenants of large, high-rise apartment building lacked reasonable expectation of privacy in common areas of building that were open to not only tenants and their visitors but to public at large); *United States v. Ramirez*, 145 Fed.Appx. 915, 922–23 (5th Cir. 2005) ("defendants possessed no reasonable expectation of privacy in the common balcony area on the second floor above the carport."); *United States v. Hawkins*, 139 F.3d 29, 32–33 (1st Cir. 1998) ("a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."); *United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) (defendants could not "have reasonably expected their privacy to extend beyond their apartment door" because apartment building's door was not locked and "inner hallway was easily accessible to tenants, visitors, solicitors, workmen and other members of the public."). In determining whether a particular area is curtilage, we consider the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *Dunn*, 480 U.S. at 301; *Cooksey v. State*, 350 S.W.3d 177, 183–84 (Tex. App.—San Antonio 2011, no pet.).

The protection afforded curtilage is not unlimited. *Cooksey*, 350 S.W.3d at 184; *Tijerina v. State*, 334 S.W.3d 825, 833 (Tex. App.—Amarillo 2011, pet. ref'd). A law enforcement officer's entry onto the curtilage or approach to the entrances of a residence does not necessarily rise to the level of a search as contemplated by the Fourth Amendment. *Tijerina*, 334 S.W.3d at 833; *Rodgers v. State*, 162 S.W.3d 698, 709 (Tex. App.—Texarkana 2005), *aff'd*, 205 S.W.3d 525 (Tex. Crim. App. 2006). For instance, a law enforcement officer, like any other member of

–6–

the public, has the right to enter onto a residential property, walk up to the front door, and knock on the front door for the purpose of contacting the occupants. *Cornealius v. State*, 900 S.W.2d 731, 733–34 (Tex. Crim. App. 1995); *Tijerina*, 334 S.W.3d at 834; *Washington v. State*, 152 S.W.3d 209, 214 (Tex. App.—Amarillo 2004, no pet.); *but see McClintock v. State*, No. 405 S.W.3d 277, 284 (Tex. App.—Houston [1st Dist.] 2013, pet. granted) (landing in front of apartment's door was part of apartment's curtilage and bringing trained drug-detection dog to conduct search from the landing in front of the appellant's door exceeded any license that impliedly may have been granted to approach and solicit residents of the apartment). A law enforcement officer may approach the residence's back door for the same purpose. *Long v. State*, 532 S.W.2d 591, 594–95 (Tex. Crim. App. 1975); *Duhig v. State*, 171 S.W.3d 631, 637–38 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *Atkins v. State*, 882 S.W.2d 910, 913 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Because entry onto the property is impliedly authorized, there is no reasonable expectation of privacy with regard to things observed by those on the pathway to the doors of the house. *Washington*, 152 S.W.3d at 214; *see also Bradley v. State*, No. 07-05-0144-CR, 2006 WL 3740335, at *3–4 (Tex. App.—Amarillo Dec. 20, 2006, pet. ref'd) (mem. op., not designated for publication) (police approached front door of residence for a "knock and talk" and, while standing at the front door, looked through an unobstructed window and could see appellant inside the bedroom holding a bag of cocaine). "If the person in possession of the property has not made express orders prohibiting any form of trespass, and if the police follow the usual path to the front door, then the police have not violated the person's Fourth Amendment rights." *See Nored v. State*, 875 S.W.2d 392, 397 (Tex. App.—Dallas 1994, pet. ref'd) (record did not show "No Entry" or "No Trespassing" signs had been posted on the fence or gate of the apartment property, and the gate was unlocked and could be opened by pushing down the handle); *see also Cooksey*, 350 S.W.3d at 184; *Tijerina*, 334 S.W.3d at 834.

*Analysis*

In this case, the police officers received an anonymous tip that narcotics were being sold out of apartment 101 of the property in question. When the officers approached the apartment to conduct a "knock and talk," they discovered that the electricity meter for the apartment had been tampered with. Roach looked through the apartment's unobstructed window and saw appellant holding a Ziplock bag containing what Roach believed to be marijuana and U.S. currency. Roach then used his flashlight "to illuminate it" and he "again believed that it was marijuana." As soon as he used his flashlight, appellant threw the Ziplock bag onto the couch, grabbed an item containing several small orange translucent baggies, "threw the contents of that object into the bathroom and the hallway," and ran down the hallway. Thomas reacted immediately after Roach shined his flashlight and shouted to appellant, "[F]lush the rock, flush the rock!"

Appellant's arguments notwithstanding, Roach was not within the apartment's curtilage when he made his observations. Roach testified that he was approximately six to ten feet away from appellant, he did not step over or into the flowerbed, the window's blinds were open, and the curtain was tied up. The area where Roach stood was accessible to the public—no gates or fences shielded it. Appellant had no reasonable expectation of privacy in the apartment complex's hallways or other common areas. *See, e.g., Acosta*, 965 F.2d at 1252 ("only when the defendant has the right to keep a place private and subject to his exclusive control would reasonable expectations of privacy attach."). Additionally, the presence of a no-trespassing sign cannot confer curtilage status on an area that otherwise lacks it. *See U.S. v. Elkins*, 300 F.3d 648, 654 (6th Cir. 2002) (areas that adjoin a commercial building but are accessible to public do not receive curtilage-like protection from a search).

Our review of the record in the light of these factors shows the officers could reasonably have concluded evidence would be destroyed or removed before they could obtain a search

warrant. Therefore, exigent circumstances existed that made the obtaining of a search warrant impracticable, and the trial court did not abuse its discretion when it denied appellant's motion to suppress.[2] We overrule appellant's first issue.

## 2. REFORMATION OF JUDGMENT

In his second issue, appellant contends the judgment should be reformed to reflect appellant's plea of "not true" to the indictment's enhancement paragraph. The judgment in this case states that appellant pleaded "true" to the enhancement paragraph, which alleged that appellant was convicted of aggravated robbery with a deadly weapon in August of 1992. The reporter's record, however, shows he pleaded "not true" to the enhancement paragraph. The State concedes the judgment should be reformed to reflect the plea of "not true," as evidenced by the record. We may correct or reform the judgment when we have the proper information to do so. *See Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd); *see also* TEX. R. APP. P. 43.2(b). Accordingly, we reform the judgment in the above case to reflect that appellant pleaded "not true" to the enhancement paragraph.

As modified, the judgment of the trial court is affirmed.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121442F.U05

---

[2] Appellant argues that the State stipulated there were no exigent circumstances in this case. According to the record, however, the State stipulated that there were no exigent circumstances *before Roach approached the window*. Such a stipulation does not render the entry invalid because the officers had probable cause to approach the apartment and exigent circumstances subsequently arose that justified their warrantless entry into the apartment.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARRELL DEWAYNE MORGAN,
Appellant

No. 05-12-01442-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F11-60422-X.
Opinion delivered by Justice Myers.
Justices FitzGerald and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Plea to 1st Enhancement Paragraph:  Not True."

As **MODIFIED**, the judgment is **AFFIRMED**.    We direct the trial court to enter a new judgment that reflects this modification.

Judgment entered this 4th day of December, 2013.

/Lana Myers/
LANA MYERS
JUSTICE